FILED
06 DEC 12 AM 11:22
CLERK U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                              Plaintiff,<br>vs.<br><br>ARTEMIO CAMACHO-CASTANEDA,<br><br>                              Defendant. | CASE NO. 06CR0956R<br><br>ORDER DENYING MOTION TO SUPPRESS EVIDENCE AND STATEMENTS ON FOURTH AMENDMENT GROUNDS |

### I.    Introduction

Defendant brings a Motion to Suppress Evidence and Statements Under the Fourth Amendment. The court held an evidentiary hearing on the motion. For the reasons set forth below, the motion to suppress statements on Fourth Amendment grounds is denied.

### II.    Factual Background as Found by the Court After an Evidentiary Hearing

On March 20, 2006, Senior Border Patrol Agent Vega began patrolling a portion of Southern California referred to in the record as the Imperial Valley sand dunes, A7 Valley, or Buttercup area, which area is roughly bordered by Interstate 8 on the north, Mexico on the south, the All-American Canal on the east, and the Buttercup campground on the west. Agent Vega began his shift at 7:00 a.m. with the belief that the area was clear of vehicles and people based upon information conveyed to him from agents on the previous shift. Transcript 1 at 21:1-25:1. Soon after his shift began, Agent Vega noticed riders of two all-terrain vehicles ("ATV's) engaged in suspicion activity. The ATVs did not have flags, as ATVs in that area

usually do for safety reasons, the two riders did not ride in pairs as riders often do, and the riders stayed away from the campground area. Transcript 1 at 32:11-22. Agent Vega testified that ATVs will generally return to the campsite periodically to refuel or for the rider to get something to drink or to rest. Transcript 1 at 26:6-9. These two suspicious ATV riders would continually drive up to the high points in the sand dunes, stop, look around, and then drive around and drive up to another high point in the dunes. Transcript 1 at 25:1-23. The ATV riders would look around as long as five or ten minutes before driving to the top of the next dune. Transcript 1 at 33: 14-16. Agent Vega testified that he has encountered smuggling groups that use ATVs for scouting or to actually bring drugs or people across the border. Transcript 1 at 26:1-21. Agent Vega knows from experience that scouts will often continually stop at high points on the dunes to look for Border Patrol Agents. Transcript 1 at 32:23-33:6.

After observing the ATV riders for awhile, Agent Vega saw a red Chevy Suburban come from the south. Transcript 1 at 35:1-25. It appeared to Agent Vega that the ATV riders were leading the Suburban. Transcript 1 at 41:3-6. Agent Vega noticed that the back windows (the rear passenger door windows and the windows to the back compartment) of the Suburban were very dark. Transcript 1 at 44:17-4515. They were more than simply tinted – they were "extremely black." Transcript 1 at 45:7-12. Agent Vega has seen the same kind of blackening on vehicles engaged in smuggling activity, so he found this fact to be significant. Transcript 1 at 45:21-46:2. At some point, one of the ATVs was east of the Suburban on top of the high canal bank and the second was at the interstate where a fence was cut. Transcript at 40:24-41:2. The Suburban drove through the opening in the fence, stopped at the interstate, and then got on the interstate and began driving eastbound. Transcript 1 at 41:9-14.

Agent Atiles, who has been a border patrol agent for 22 years and who was in charge of the operation that led to defendant's arrest, testified that based on his knowledge and experience patrolling the area and given the observations of his team, he believed the Suburban entered from Mexico without passing through a port of entry. Transcript 2 at 6:12-18 and 11-1-16:17. Moreover, the Suburban could not have entered at a port of entry because there are no established ports of entry along the border in this area. Transcript 2 at 16:18-22. Agent

Atiles' conclusion is supported by a review of the photographic aerial map of the area considered in conjunction with testimony regarding the sandy terrain in this area as well as other physical impediments to travel in this area.

Once on the interstate, the Suburban traveled east for four or five miles at a speed that appeared to be inappropriately slow. Transcript 1 at 47:1-14. At Ogilby Road, the Suburban exited and proceeded to re-enter Interstate 8, although this time it proceeded westbound. Transcript 1 at 46:6-4721. It is Agent Vega's experience that vehicles carrying contraband in this area will engage in such a maneuver in order to ascertain if anyone is following them. Transcript 1 at 47:15-48:6.

While Agent Vega was observing the ATV riders and the Suburban, he was continually relaying his observations to his fellow agents, including Agents Castaneda and Atiles, by radio. Transcript 1 at 48:23-9 and 124:12-16; Transcript 2 at 19:13-18. When the Suburban exited and reentered the interstate going west, Agent Atiles made the decision to deploy a Stinger spike strip in an effort to stop the Suburban. Transcript 2 at 19:9-11. Stinger spike strips are different than regular spike strips because they are designed to puncture the tire in such a way that the air releases slowly and at a more even pace, which makes them safer than regular spike strips. Transcript 2 at 37:8-19.

Once the Stinger spike strip was deployed and the tires of the Suburban came in contact with the strip, defendant proceeded for awhile traveling westbound in the westbound lanes and then crossed the median and continued traveling westbound in the eastbound lanes into oncoming traffic. Transcript 1 at 106:1-24. The Suburban eventually came to a stop, at which time defendant exited the vehicle. At this point, Agent Castaneda drew his gun and identified himself as an agent. Transcript 2 at 3:30-4:1. Defendant then put his hands up and Agent Castaneda requested that defendant drop to the ground on his knees with his hands behind his head. Transcript 2 at 4:2-4. Agent Castaneda then placed defendant in handcuffs. Transcript 2 at 4:4-5.

### III. Analysis

**A. Did the agents comply with the Fourth Amendment when they stopped defendant?**

Agent Castaneda testified at the evidentiary hearing that he arrested defendant after defendant exited the vehicle, see Transcript 2 at 4:5, and the court agrees that defendant was arrested at this time. See Kraus v. Pierce County, 793 F.2d 1105, 1109 (9th Cir. 1986) (explaining that the Ninth Circuit "has made it clear that where force is used such that the innocent person could reasonably have believed he was not free to go and that he was being taken into custody indefinitely, an arrest has occurred"). Therefore, the court considers whether there was probable cause to arrest defendant.

"Probable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime." United States v. Buckner, 179 F.3d 834, 837 (9th Cir.1999) (internal quotation marks and citations omitted); United States v. Ortiz-Hernandez, 427 F.3d 567, 573 (9th Cir. 2005). In determining the existence of probable cause, the court may consider the officer's experience and expertise as well as whether the area is a high-crime area. United States v. Ortiz-Hernandez, 427 F.3d 567, 573 (9th Cir. 2005); United States v. Hoyos, 892 F.2d 1387, 1392 (9th Cir.1989).

Having carefully considered the evidence, outlined *supra*, regarding the behavior of the ATV riders and defendant, the condition of the Suburban's windows, the officers' experience and expertise in intercepting smugglers in this area, which is well-known for its smuggling activity, and Agent Atila's conclusion, supported by the evidence, that defendant could only have come from Mexico, the court concludes there was probable cause to arrest defendant because there was a fair probability that defendant was engaged in smuggling activity.[1] Cf. United States. v. Hernandez-Garcia, 284 F.3d 1135, 1140 (9th Cir. 2002) (finding probable cause to arrest where "agents had seen the white van and two others come across the border

---

[1] It does not matter that defendant may have been arrested for an immigration offense. See Devenpeck v. Alford, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004) (holding that as long as "the facts known to the arresting officer at the time of the arrest" supported probable cause, the arrest was proper even if the officer invoked the wrong offense).

in an area frequently used by alien smugglers, at a place not designated as a point of entry, then cross traffic onto the interstate over the median, not at an entryway, and proceed west in a hurry.").

Defendant argues that, even assuming there was probable cause to arrest him, the force the agents used to arrest him was excessive in light of their use of the Stinger spike strip. The court need not determine whether and to what extent the Stinger may pose a danger to drivers in some cases because, in this case, the force imposed upon defendant by use of the Stinger spike strip was minimal, at best, as it performed in its intended manner without any resulting personal injury to defendant. Thus, as in Hernandez-Garcia, there is "no basis for invalidating the arrest, or suppressing evidence, on account of use of the spike [strip]." Id.

## IV. Conclusion

For the reasons set forth above, the Motion to Suppress Evidence and Statements Under the Fourth Amendment is denied.

**IT IS SO ORDERED.**

DATED: 12/11, 2006

JOHN S. RHOADES, SR.
United States District Judge

cc:   All parties